[No. 10151.   Department One.   November 12, 1912.]

## Louis H. Melius, *Respondent*, v. Chicago, Milwaukee & Puget Sound Railway Company, *Appellant*.[1]

Master and Servant—Injury to Servant—Safe Appliances—Common Use—Question for Jury.   Although the preponderance of the evidence shows that a "pin-and-ring" coupling is a safe and standard safety appliance for the equipment of railroad dump cars, where there was evidence that the nose or outward curve at the point of the pin did not insure the proper degree of safety and that the pins on the particular car were shorter than they should have been, and that a sudden tightening of the chain would have a tendency to throw the point out; the question should be submitted to the jury, even if it was not probable that the two chains could become uncoupled at the same time and from the same cause.

Appeal—Review—Harmless Error—Instructions.   Prejudicial error may not be predicated on instructions that do not fit the facts of the particular case where other proper instructions were given so that the law of the case was before the jury.

Master and Servant—Injury to Servant—Method of Work—Contributory Negligence—Question for Jury.   An experienced brakeman on ordinary trains is not guilty of contributory negligence, as a matter of law, when working on a dirt train, in following the direction of the conductor to turn on the air by means of an angle cock at the side of the car, instead of going to one at the end of the car, where he had no reason to apprehend danger.

Same—Fellow Servants—Conductor and Brakeman.   A conductor of a dirt train engaged in remedying a defect in a dump car is not a fellow servant of a brakeman, assisting him and working under his direction, but is a vice principal.

Appeal—Review—Harmless Error—Instructions.   A cause will not be reversed for the giving of instructions requested by both sides, hostile in theory and confusing, where the jury was not misled, although the court should have adopted a theory of its own, or given the instructions requested by one side only.

Appeal from a judgment of the superior court for Pierce county, Easterday, J., entered October 23, 1911, upon the verdict of a jury rendered in favor of the plaintiff, for per-

[1]Reported in 127 Pac. 575.

sonal injuries sustained by a brakeman employed on a work train. Affirmed.

*George W. Korte* and *H. S. Griggs*, for appellant.

*Johnston & McMenamin*, for respondent.

CHADWICK, J.—Plaintiff, an experienced brakeman, was employed by the defendant on a dirt train. The train was made up of an engine and forty cars of a type known as the Western Air Dump car. At the time of the accident, to which we shall presently refer, the crew, consisting of a conductor, two brakemen, and the enginemen, were filling a trestle. The train had been hauled from where the steam shovel was operating to the trestle, and the loads had been dumped. The dumping was accomplished through the instrumentality of compressed air operated from the engine. The cars were equipped with eight chains, four on either side. Two of the chains were used to pull the bed of the car back to its normal position after being dumped; and two, one of which was near each end of the car, were used to hold the car in its position when loaded or after it was unloaded. These chains, which we shall call stay chains, were fastened, one end to the trucks and the other end to the body or bed of the car. They were broken in the center so they could be coupled or uncoupled as occasion required. The coupling was the old-fashioned hook and ring, called by some of the witnesses a "toggle"; it being in all essential particulars the same as the rough lock chain which was in common use in the early days when heavy freighting was done by teams, the hook on one end of the chain having sufficient spread to hold the link on the end of the other. The tongue of the hook folded back on the link to which it was attached, the link being hammered down to two parallel bars against which the tongue was placed, and over all the ring was slipped so that it was held fast, not only by the law of gravity, but by friction as well. When the car was to be dumped, the ring was knocked off

the hook or lip, allowing the hook to drop or unfold, thus separating or opening the chain. A car is dumped on the side opposite the broken chains, no account being taken of the chains on what may be called the down side of the car.

On one of the cars, No. X1057, it seems that the mechanism through which the air was applied had become deranged, so that the car could not be righted from the engine. The train was then moved from the trestle, the bed of the car being in an oblique position. When upon solid ground, the crew, under direction of the engineer, undertook to remedy the defect. It was found that the piston had slipped out of the sleeve of the cylinder, the cylinder being a part of the air equipment on each car. The conductor obtained a block to hold the cylinder in position, intending to throw the piston back in its place by the application of the air. This he instructed plaintiff to turn on. There were two ways to do this, one by operating an angle cock at the end of the car where there would have been no danger, and one by manipulating an angle cock on the up side of the car. The conductor blocked the piston head and plaintiff turned on the air as directed. The car righted itself but, instead of stopping when the bed had resumed a horizontal position, it went on over, catching plaintiff and inflicting the injuries of which he now complains. The car tripped because the stay chains on the then down side of the car became unlocked, and being already loose on the up side of the car, there was nothing to stay it in position. While possibly more pertinent to our subsequent discussion, for the sake of keeping the facts together and in mind, it may be said, that the conductor testified that the chains were in place and fastened before he undertook to right the car, that he kicked a hole in the snow underneath each chain so that they would hang vertically.

It is the theory of the plaintiff that, because the pin coupling was curved in at the point, rather than out, as he says it should have been, the sudden uprighting of the car

tended to throw the rings off the chains.   The defendant's theory is that, inasmuch as the car had been hauled a considerable distance with the stay chains on the down side loose and dragging, they had become unfastened and were loose at the time the attempt was made to right the car.   The law of gravity and certain principles of natural philosophy are referred to and relied upon.   The negligence of the defendant is alleged to be in this, that standard and safe equipment had been taken off the car and unsafe and improper hooks and rings had been substituted; that is to say, the hooks on car X1057 inclined inward and tapered at the point, so that the ring would have a tendency to slip off if weight or sudden strain were put upon the chain.   Besides the general denials, defendant pleaded assumed risk, that plaintiff was a fellow servant with the conductor, and contributory negligence.   From a judgment in favor of the plaintiff, defendant has appealed.

The first error assigned, and this comprehends about all of the questions raised by appellant, is that the court erred in overruling defendant's motion for a directed verdict.   The gist of this motion is that the evidence is undisputed that the coupling with the hook and ring described in the complaint was of standard construction and make, and in common use, and is in fact the only practical appliance.   We think that it is shown by a very clear preponderance of the evidence that the pin-and-ring coupling is a safe and standard appliance, and is more practical than the one which respondent insists should have been used.   This is described as a plate or locking attachment.

"It slips down over the two guys at the sides of the link. There are two holes opposite each other and one on the point that slips over the point of the finger.   It drops down over the point and also holds the hook when it is up in place.   To then unlock it, you must slip it up and the point drops down."

But these are questions of fact to be decided by the jury, and there was testimony from which it might have found that

the pin-and-ring coupling was not a proper or safe appliance; or, if so, whether a nose or outward curve at the point of the pin was necessary to insure the proper degree of safety, and also whether the pins on the particular car were shorter than they should have been. There was much evidence to show that a nose or outward bend on the hook would tend to lessen the efficiency of the appliance and increase the danger of its breaking, but this conflict or question is sufficient to sustain the verdict upon general grounds and, although appellant's cars were equipped generally with proper couplings, the jury has said, considering the evidence in this case, that the ones on car No. X1057 did not comply with the standard set by the witnesses for the appellant.

Nor can we hold to the theory of physical impossibility. It would seem that this might be so and yet, by reason of the alleged inward slant—there was at least one witness who said that the hooks on these chains were somewhat shorter than they were on other cars—it may be that the sudden tightening of the chain would tend to throw the point out. This might have caused the ring to slip beyond the point of contact. It is further urged that, although it be admitted that one of these chains might have been so deficient that the ring would slip off while it was in an upright position, it would be practically impossible for the two chains to break at the same time. There is evidence to show that the holding of any particular chain depends entirely upon the size of the ring and the shape of the hook. Two witnesses so testified. We cannot say as a matter of law that it was impossible for the two chains to become uncoupled at the same time and from the same cause. The question was for the jury.

Complaint is made that certain instructions do not state the law. We think that this may be admitted in this respect, that they do not fit the facts of this particular case. Some of them seem to be drawn on the theory that the instrumentality alleged to be deficient was under the immediate charge and direction of the plaintiff, and to some extent at least do

not state the rule as we understand it to be. But under several decisions rendered by this court within the past few years, we feel that we would not be warranted in holding that the defendant was thereby prejudiced, inasmuch as other and proper instructions were given, so that the law of the case was before the jury.

It is also complained that plaintiff is guilty of contributory negligence. While plaintiff was an experienced brakeman upon ordinary trains, his acquaintance with these dump cars was slight, and to hold that he was guilty of, contributory negligence because he followed the direction of the conductor and turned on the air by means of the angle cock on the side of the car, instead of going to the end of the car and using the angle cock there situated, would, we think, be carrying the rule too far. Plaintiff had no reason to apprehend danger. The jury must have believed his testimony and the testimony of the conductor when they said that the chains on the down side of the car were in position, and if the instrumentality had been perfect or reasonably so, the accident would not have happened.

The conductor was not the fellow servant of plaintiff. He had charge and direction of the work in hand. He was in authority. This fact distinguishes this case from *Jock v. Columbia & Puget Sound R. Co.*, 53 Wash. 437, 102 Pac. 405, and kindred cases. It falls rather under the rule stated in *Martin v. Hill*, 66 Wash. 433, 119 Pac. 849. Respondent and the conductor were not acting together, that is, upon equal terms. The one was there to do the bidding of the other. The character of the work required direction, and the conductor stood in the place of the master.

It is complained that the trial judge gave inconsistent instructions; that both plaintiff and defendant requested instructions hostile in theory, and by giving them, confusion rather than direction was put upon the jury. What we have already said indicates our purpose to affirm this case, for we are unable to say, in the light of the facts, that the jury

was misled. But we have said before and now desire to say, that all cases should be tried on a certain theory; that whatever theory may be entertained by counsel, the court is the guiding and directing genius of the trial, and out of the conflict of opinion should adopt a theory of its own. It is proper for counsel to request instructions, but instructions when requested by both sides should not be given when they cover the same point. If it be so, the instructions are unnecessarily drawn out, tend to confusion, or become meaningless because of constant repetition. As a rule, the law of a case can be covered by very few instructions and we would suggest that, if requested instructions are to be adopted by the court, those requested by the one side or the other be rejected.

The record is faulty in the respect complained of, but we are unwilling, considering the facts of the particular case and the probability of a like verdict upon retrial, to order a reversal. Affirmed.

Gose, Crow, and Parker, JJ., concur.